19884

The STATE, Respondent, v. David SPEIGHTS, Appellant

(208 S. E. (2d) 43)

128

*Messrs. Ernest B. Hinnant* and *Raymond K. McKenzie,* of Florence, *for Appellant,*

*Messrs. Daniel R. McLeod, Atty. Gen.* and *C. Tolbert Goolsby, Jr., Dept. Atty. Gen.* and *Ms. Karen LeCraft Henderson, Asst. Atty. Gen.,* of Columbia, and *T. Kenneth Summerford, Sol.,* of Florence, *for Respondent,*

Aug. 29, 1974.

LITTLEJOHN, Justice:

The defendant David Speights was tried upon an indictment charging him with the murder of his brother-in-law, Laverne "Pete" Graham. He has appealed from his conviction by a jury of the offense as charged and his subsequent sentence to death by electrocution.

The primary thrust of Speight's contentions is directed upon a number of constitutional grounds. He also asserts that the trial court erred in disqualifying a member of the jury panel who expressed on *voir dire* her opposition to capital punishment, that the trial court erred in admitting into evidence a confession made by him, and that the trial court erred in denying his motions for a directed verdict.

We first treat the directed verdict issue:

Upon appellate review of a trial court's refusal to direct a verdict in favor of a defendant, the evidence and the inferences which may be reasonably drawn therefrom must be viewed in the light most favorable to the State. Cases collected, 7A South Carolina Digest Criminal Law § 1144(13) (1971).

On the morning of October 15, 1973, the body of Laverne Graham was found in his wrecked automobile off U. S. Highway 52, approximately two miles north of Cowards, South Carolina. The investigating officer observed two wounds on the left side of Graham's head. A lead fragment was found imbedded on the inside of the right door. The left door post also showed what appeared to be a bullet hole and an impression where another bullet had struck the door post. The vehicle had apparently traveled an irregular course for a distance of approximately 800 feet after leaving the highway, coming to rest in a ditch.

Dr. Joel S. Sexton, the examining pathologist, testified that he noted two missile wounds just above Graham's left ear, both of which continued into the brain. Dr. Sexton testified that Graham's death was caused by shotgun wounds to the brain. He estimated the time of death as between 7:00 and 7:30 on the morning of October 15, 1973. He further testified that Graham had been shot at close range, probably from a distance of a few yards. Both he and a State Law Enforcement Division agent identified the lead fragments removed from Graham's brain as buckshot pellets.

Lena Bell Speights, the defendant's wife and the deceased's sister, testified that Graham and the defendant had been involved in an argument on July 13, 1973, at which time the defendant had shot at her and at Graham, prompting Graham to shoot the defendant.

In the early morning of the day of Graham's death, the defendant got into his car and left the home of Eddie Mae Hanna, with whom he had been living since his separation from his wife. Shortly after 6:00 a. m. a car resembling the defendant's car was seen parked along the side of a road in the vicinity where Graham was killed. Miss Hanna testified that upon the defendant's return to her house at approximately 7:30 a. m., he told her that "he did what he said he was gonna do." She further testified that the defendant had told her "when he first got shot that he was gonna get Pete."

Later that same day the defendant was taken into custody at his place of employment and carried to the Florence County Detention Center. Deputy Sheriff Ray Shupe, Chief Investigator for the Florence County Sheriff's Department, testified that after being advised of his constitutional rights (Miranda) the defendant identified a shotgun (shown to the authorities by Miss Hanna shortly after the discovery of Graham's body) as his gun. The defendant then admitted that, while he was driving his car on Highway 52, he saw a vehicle driven by Graham, that he drove up alongside Graham's car, and that he put his shotgun out of the window

of his car and pulled the trigger. He further admitted that he had shot Graham because the latter had shot him three months earlier and had made threats against him. Shupe then testified that the defendant stated, "I decided to get him first." Shupe's testimony was corroborated in large part by two other officers who were present when the defendant was interrogated.

To support his contention that the trial judge erred in refusing to direct a verdict of not guilty, the defendant first invokes the well-established rule that a conviction cannot be had on the extra-judicial confession of a defendant uncorroborated by proof aliunde of the corpus delicti. Cases collected, 7A South Carolina Digest Criminal Law Key No. 535(1) (1971). In a homicide case the corpus delicti consists of two elements: death of a human being, and the criminal act of another causing death. Cases collected, 11 South Carolina Digest Homicide Key No. 228(1) (1971, Cum. Supp. 1973). While these must be established by the best proof obtainable, direct and positive evidence is not essential, and such may be sufficiently proven by presumptive or circumstantial evidence when that is the best obtainable. Cases collected, 11 South Carolina Digest Homicide Key No. 228(2) (1971, Cum. Supp. 1973). In this instance one need look no further than the testimony of Dr. Sexton and Miss Hanna, summarized hereinabove, in order to find sufficient proof of the two necessary elements.

In his argument concerning the sufficiency of the circumstanial evidence in this case, the defendant appears to have lost sight of the distinction between the stanard applicable to the jury in its deliberations and the standard applicable to the trial court in its consideration of a motion for a directed verdict, a distinction to which this Court addressed itself in *State v. Littlejohn,* 228 S. C. 324, 89 S. E. (2d) 924 (1955):

"It must be remembered, too, that there is one test by which circumstantial evidence is to be measured by the jury

in its deliberations, and quite another by which it is to be measured by the trial judge in his consideration of the accused's motion for a directed verdict. As to the former, it is necessary that every circumstance relied upon by the state be proven beyond a reasonable doubt; and that all of the circumstances so proven be consistent with each other and, taken together, point conclusively to the guilt of the accused to the exclusion of every other reasonable hypothesis. . . . But on a motion for direction of verdict, the trial judge is concerned with the existence or nonexistence of evidence, not with its weight; and, although he should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty, it is his duty to submit the case to the jury if there be any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced."

It is our conclusion that the circumstances heretofore related were sufficient to warrant an inference of guilt, thus requiring the trial judge to submit the issue to the jury. There was no error in so doing.

The defendant next contends that his confession was inadmissible for two reasons: first, because he did not knowingly and voluntarily waive his privilege against self-incrimination and, secondly, because the confession was the direct result of police coercion.

When it became apparent during the course of the trial that the State proposed to offer in evidence a confession made by the defendant, the trial judge, in the absence of the jury, heard rather detailed testimony on behalf of the State and on behalf of the defendant relative to the circumstances attendant to and surrounding said confession. After concluding that it was admissible, the trial judge submitted to the jury under appropriate instructions the issue of whether the confession was free and voluntary and, therefore, whether it should be considered or rejected by it.

At the evidentiary hearing the State presented four witnesses, three of whom were the officers who were present at the time the confession was made. Their testimony was contradicted by that of the defendant. It thus becomes apparent that the defendant's contenton as to the inadmissibility of his confession is premised upon a factual conflict which was resolved against him by the trial judge. Because his conclusions are clearly supported by the evidence, we cannot say that the trial judge erred in admitting the challenged confession.

Before this Court the defendant argues that the trial court erred in disqualifying a member of the jury panel as a result of interrogation on *voir dire*. The objection which he would now raise was not submitted to the lower court. In *State v. Bellue,* 259 S. C. 487, 193 S. E. (2d) 121 (1972), we said:

" 'The rule is well established that if asserted errors are not presented to the lower court, the question cannot be raised for the first time on appeal. *State v. Alexander,* 230 S. C. 195, 95 S. E. (2d) 160, and *State v. Bolin,* 230 S. C. 204, 95 S. E. (2d) 163.' *State v. McCrary,* 242 S. C. 506, 131 S. E. (2d) 687 (1963)."

The defendant next challenges the validity of the imposition of the death penalty.

At the time Graham was killed and at the time the defendant was tried, § 16-52 of the Code of Laws of South Carolina (1962) provided as follows:

"Punishment for murder—Whoever is guilty of murder shall suffer the punishment of death; *provided, however, that in any case in which the prisoner is found guilty of murder the jury may find a special verdict recommending him to the mercy of the court, whereupon the punishment shall be reduced to imprisonment in the Penitentiary with hard labor during the whole lifetime of the prisoner."*

In *State v. Harper,* 251 S. C. 379, 162 S. E. (2d) 712 (1968), this Court had the occasion to rule upon the con-

stitutionality of this section in the light of *United States v. Jackson,* 390 U. S. 570, 88 S. Ct. 1209, 20 L. Ed. (2d) 138 (1968) ; we held that § 17-553.4 of our code, which permitted one to plead guilty and by so doing be assured of a life sentence, unconstitutional. We held that this section was severable from § 16-52 and stated: "Section 16-52, standing alone, is not unconstitutional under the test applied in *Jackson.*" We further state that "Section 16-52 remains as a fully operative law."

Our *Harper* ruling was before the case of *Furman v. Georgia,* 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. (2d) 346 (1972), in which the Supreme Court of the United States dealt with a statute in Georgia similar to ours. We do not construe *Furman* as holding the death penalty unconstitutional per se, nor as invalidating either the death penalty section or the mercy proviso section of the Georgia statute or of our statute. It merely held that the imposition of the death penalty under a statutory scheme growing out of a combination of the death penalty section and the mercy proviso section was unconstitutional because the scheme as heretofore applied made the penalty discretionary with the jury; it held that the death penalty *as heretofore applied* constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.

Since *Furman,* in the case of *State v. Gibson,* 259 S. C. 459, 192 S. E. (2d) 720 (1972), we held:

"The *Furman* case permits us to affirm the judgment of conviction of the appellant of murder and to reverse only the imposition of the death penalty, leaving him subject to sentence under Section 16-52 of the Code, as though the jury had recommended mercy." Also see *State v. Bellue, supra.*

It is obvious that this Court, after *Furman,* approved the use of the mercy proviso because the life imprisonment penalty appears only therein. It is common knowledge that since

*Furman* circuit judges have been sentencing defendants convicted of murder to life imprisonment, which is completely inconsistent with a ruling that the mercy proviso has been declared unconstitutional. This Court did not hold in *Harper,* and has not held since *Furman,* either the death penalty section or the mercy proviso section unconstitutional. The solicitor and the trial judge in the court below took the position that the mercy proviso section was unconstitutional and proceeded to try the case as if the statute read as follows:

"Whoever is guilty of murder shall suffer the punishment of death."

The judge charged the jury, "Upon the return of that verdict [guilty], it is the law of our state that punishment for the offense of murder is death by electrocution. It would be then the duty of the court to impose that penalty upon the defendant party." No reference was made to the mercy provision.

We think the lower court erred in imposing the death penalty. We need not reach the severability issue inasmuch as neither the United States Supreme Court nor this Court has held any part of Section 16-52 unconstitutional. The vice lies only in its former application.

It is not necessary to rule upon other issues argued, in the light of our disposition of the death penalty issue.

The judgment of conviction of murder is affirmed, but the death penalty is reversed and vacated; and this case is remanded to the Court of General Sessions for Florence County for the purpose of sentencing the defendant to life imprisonment under § 16-52 of the Code as if the jury had returned a verdict of guilty of murder with recommendation to mercy.

Affirmed in part; reversed in part.

Moss, C. J., LEWIS and BUSSEY, JJ., and E. HARRY AGNEW, Acting J., concur.